## THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DEBRA GOTOVAC and
BRAD BOLEN,

      Plaintiffs,

vs.                                                                                          No. CIV 19-0783 JB/LF

IZZY TREJO, Executive Director,
New Mexico Racing Commission,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Dismiss, filed October 25, 2019 (Doc. 12)("Motion"). The Court held a hearing on December 3, 2019. The primary issues are: (i) whether Plaintiffs Debra Gotovac and Brad Bolen's allegation in the Complaint for Damages for Constitutional Violations, filed August 27, 2019 (Doc. 1)("Complaint"), that Defendant Izzy Trejo, Executive Director of the New Mexico Racing Commission ("NMRC"), allowed the transfer of horses in violation of the NMRC's Code of Conduct, states a claim under the Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution of the United States of America; (ii) whether Trejo's actions violate the Equal Protection Clause of the Fourteenth Amendment; and (iii) whether Trejo is entitled to qualified immunity from the Plaintiffs' claims. The Court concludes that: (i) Trejo did not violate Gotovac and Bolen's procedural or substantive Due Process rights, because Gotovac and Bolen do not have property or liberty interests in the qualifying race's outcome; (ii) Trejo did not violate the Equal Protection Clause, because Gotovac and Bolen have not alleged that they were treated differently than similarly situated owners; and (iii) qualified immunity protects Trejo, because Gotovac and

Bolen have not alleged that Trejo violated a clearly established constitutional right.  The Court, accordingly, grants the Motion to Dismiss.[1]

## FACTUAL BACKGROUND[2]

On August 9, 2019, the NMRC suspended trainer Sterlen Trey Woods pending the result of a hearing scheduled August 18, 2019.  See Initial Ruling of the New Mexico Racing Commission at 1 (dated Aug. 9, 2019), filed August. 9, 2019 (Doc. 1-2)("Initial Ruling").  The hearing concerned the confirmed positive test of albuterol,[3] in a sample taken from his first-place finisher horse in a qualifying race held July 27, 2019 at the Ruidoso Downs Racetrack in Ruidoso, New Mexico. See Complaint ¶ 9 at 2.  Under normal circumstances, horses trained by a New Mexico trainer under suspicion of illegal drugging are not eligible for transfer, pursuant to New

---

[1]Gotovac and Bolen have filed a motion to amend the Complaint.  See Plaintiff's Opposed Motion to Amend Complaint, filed July 24, 2020 (Doc. 20)("Amendment Motion").  The Court has scheduled a hearing on the Amendment Motion for September 14, 2020.  As the Court has not held a hearing on the Amendment Motion, however, the Court will not address amendment or supplementation here.

[2]The factual background, as written here, is taken from Gotovac and Bolen's Complaint and its attachments therefore represents their version of events.  See Complaint ¶¶ 8-17, at 2-3. The Court makes no conclusions on the truth of Gotovac and Bolen's allegations.

[3]Albuterol, a Class 3 controlled substance that carries a Class A penalty, is used as bronchodilators as therapeutic treatment for obstructed airways, but because of its potential steroidal effects, it is banned in New Mexico horse racing.  Albuterol, along with a similar drug, clenbuterol, is a zero tolerance drug according to the New Mexico Racing Commission.  See New Mexico Regulator Moves Toward Ban of Albuterol, BloodHorse, https://www.bloodhorse.com/horse-racing/articles/231819/new-mexico-regulator-moves-toward-ban-of-albuterol (last visited Aug. 28, 2020).  The Association of Racing Commissioners International assigns albuterol a Class A penalty in quarter horse races.  See Uniform Classification Guidelines for Foreign Substances and Recommended Penalties Model Rule, P. 49. http://arci.com/wp-content/uploads/2019/01/2019-01-07-Classification-Substances.pdf (last accessed September 2, 2020)("ARCI Note").  For a Class A violation, a licensed trainer, on his or her first offense, receives a minimum one-year suspension, and up to three years if there are aggravating circumstances.  See ARCI Note at 49.

Mexico Administrative Code ("NMAC") §§ 12.2.1.9(B)(8)[4] and 15.2.5.12(A)(5).[5]  See Complaint ¶ 10, at 2.  Because of a two-day delay in receiving the positive test results at the NMRC offices and notifying Woods, however, Trejo allowed Woods' other horses to be transferred to other trainers.  See Letter from Ismael Trejo to the Racing Community at 1 (dated Aug. 13, 2019) filed August 27, 2019 (Doc 1-3)("Trejo Letter") Complaint ¶ 12 at 2.  Trejo asserted that this decision was in the "spirit of fairness," as the confirmed positive test had arrived at NMRC's offices on August 7, 2019, but Woods was not notified until August 9, 2019.  See Trejo Letter at 1; Complaint ¶ 12 at 2.  The horses that were transferred were allowed to run in the August 16-17, 2019, trials for the All American Futurity race at Ruidoso Downs.[6]  See Complaint ¶ 14 at 3.  Two of Woods' previously scratched horses placed within the top five, while Gotovac and Bolen's horse fell out of the top five.  See Complaint ¶ 15, at 3.  Gotovac and Bolen allege Trejo's decision was "influenced by the political connections of several of the horse owners."  See Complaint ¶ 16, at 3.

---

[4]This provision governs the effect of the NMRC's rulings.  It provides that "[r]ulings against a licensee apply to another person if continued participation in an activity by the other person would circumvent the intent of a ruling by permitting the person to serve, in essence, as a substitute for the ineligible licensee," NMAC § 15.2.1.9(B)(8)(a), that "[t]he transfer of a horse to avoid application of a commission rule or ruling is prohibited," NMAC § 15.2.1.9(B)(8)(b), and that "[t]he stewards shall honor the rulings issued by other pari-mutuel racing commissions," NMAC § 15.2.1.9(B)(8)(c).

[5]This provision states that a horse is ineligible to start in a race when "it is wholly or partially owned by a disqualified person or a horse is under the direct or indirect training or management of a disqualified person." NMAC § 15.2.5.12.

[6]The All American Futurity race is a race for two-year-old American quarter racehorses.  With a $3 million purse, it is the highest prize for a two-year-old of any horse breed in North America.  It takes place every Labor Day at Ruidoso Downs and is the last leg of the American Quarter Horse Association Triple Crown.  See All American Futurity, https://www.raceruidoso.com/info/all-american-futurity (last accessed Aug. 28, 2020).

## PROCEDURAL BACKGROUND

In the complaint, Gotovac and Bolen allege three causes of action.  See Complaint ¶ 1, at 1. They allege violations of the Due Process Clause, the Equal Protection Clause, and of the Fourteenth Amendment under § 1983.  See Complaint ¶ 1, at 1.  In his Motion, Trejo asks the Court to "enter an order dismissing this case with prejudice," See Motion at 4, because Gotovac and Bolen do not state claims for relief, and because qualified immunity protects Trejo's actions.

### 1.      The Complaint.

Gotovac and Bolen filed the Complaint in federal court on August 27, 2019.  See Complaint at 1.  They allege that Trejo allowed an unlawful transfer of Woods' horses.  See Complaint ¶ 11, at 2.  This transfer, they argue, allowed two of the horses that had previously belonged to Woods to place in the trials for the All American Futurity race at Ruidoso Downs, causing Gotovac and Bolen's horse to be kicked out of the top five and therefore not qualify for the All American Futurity race.  See Complaint ¶ 14-15, at 3.  Gotovac and Bolen argue that these actions violate their right to due process and equal protection pursuant to 42 U.S.C. §1983, and that Trejo's actions violate the Horse Racing Act, N.M. Stat. Ann. § 60-1A-1 through -30, and its implementing regulations at NMAC §§ 15.2.1 through 15.2.7.  See Complaint ¶¶ 1-2, at 1.

Gotovac and Bolen assert three claims.  See Complaint ¶¶ 18-59, at 1. First, they allege a violation of the Due Process Clause pursuant to § 1983.  See Complaint ¶ 19, at 1.  Their second claim is for violation of the Equal Protection Clause pursuant to § 1983.  See Complaint ¶¶ 46-50, at 7.  They assert the third claim is a violation of the Fourteenth Amendment pursuant to § 1983. See Complaint ¶¶ 51-59, at 7.  As relief, Gotovac and Bolen ask the Court to: (i) conclude that Trejo has violated their constitutional right to due process; (ii) conclude that the Trejo's actions described in the Complaint establishes a pattern and practice that Racing Commission employees violate the Racing Commission's governing laws, regulations, policies and practices; (iii) conclude

that Trejo violated Gotovac and Bolen's right to equal protection under the law; (iv) award attorney's fees and costs; (v) award general compensatory damages; (vi) award punitive damages; (vii) award interest on damages; and (viii) award any and all other relief that may be appropriate as deemed by the Court.  See Complaint ¶¶ A-H, at 9.

>        2.        **The Motion**.

Trejo asks the Court to dismiss all counts set forth in the Complaint under rule 12(b)(6) of the Federal Rules of Civil Procedure.  See Motion ¶ 1, at 1.  Trejo also asserts that qualified immunity protects his actions.  See Motion ¶ 23, at 8. He argues that Gotovac and Bolen have not stated a claim for which relief can be granted under rule 12(b)(6).  See Motion ¶ 8, at 3.

Trejo asserts that the Court must dismiss the due process claim as Gotovac and Bolen have "not explained what concrete life, liberty, or property interest Defendant allegedly infringed." Motion ¶ 14, at 5.  Trejo asserts that the Complaint's allegations that Gotovac and Bolen's horse would have placed in the top five had the NMRC not allowed horses formerly trained by Woods to race is flawed, as, according to Trejo, Gotovac and Bolan have no "rational basis to predict the outcome of any particular hypothetical horse race with certainty based on the standings from a race that actually occurred."  See Motion ¶ 15, at 5.  Trejo argues that Gotovac and Bolen's assumptions that their horse would have qualified if not for the horses that Woods formerly trained does not create a tangible life, liberty, or property interest, and therefore there is no valid due process violation. See Motion ¶ 15, at 6.

Trejo then contends that the equal protection claim fails for similar reasons.  He argues that his administrative decision, which NMAC § 15.2.1.8(B)(2)[7] fully authorizes, conforms to the

---

[7]This provision states: "To the extent permitted by the Act the commission may delegate to the agency director and the stewards all powers and duties necessary to fully implement the purposes of the Act."  NMAC. Code § 15.2.1.8(B)(2).

rules' stated intent.  <u>See</u> Motion ¶¶ 18-20, at 7.  Trejo asserts that Gotovac and Bolen do not explain how Trejo's implementation of the rules specifically targeted them, and thus Gotovac and Bolen were not deprived of equal protection under the law.  <u>See</u> Motion ¶ 22, at 8.

Finally, Trejo argues that, in addition to Gotovac and Bolen's constitutional claims being legally deficient, qualified immunity bars their claims.  <u>See</u> Motion ¶ 23, at 8.  Trejo asserts that "if qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  <u>See</u> Motion ¶ 24, at 8 (quoting <u>Lewis v. Tripp</u>, 604 F.3d 1221, 1230 (10th Cir. 2010)(internal quotation marks omitted)).  Trejo asserts that the Gotovac and Bolen '"must demonstrate: (i) that the Defendant's actions violated his or her constitutional or statutory rights, and (ii) that the right was clearly established at the time of the alleged misconduct."'  Motion ¶ 25, at 8 (quoting <u>Gerhardt v Mares</u>, 179 F. Supp. 3d 1006, 1003 (D.N.M. 2016)(Browning, J.)).  Trejo asserts again that the Gotovac and Bolen cannot point to any precedent establishing any right that was violated and that "Defendant's actions in following the NMAC do not constitute a violation of Plaintiffs' clearly established rights."  <u>See</u> Motion ¶ 26, at 9.  Accordingly, Trejo argues that he is entitled to qualified immunity.  <u>See</u> Motion ¶ 27, at 9.

### 3.    **The Response**.

Gotovac and Bolen respond.  <u>See</u> Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss, filed November 7, 2019 (Doc. 13)("Response").  First, they assert that the Court should not grant the Motion, as they argue Trejo deprived them of the full opportunity to engage in their chosen profession of horse racing by their horse not qualifying for the All-American Futurity race, which Plaintiffs assert is a property interest.  <u>See</u> Response at 1.  They also assert that he did not follow the stated rules regarding the transfer of horses from disqualified trainers and therefore violated their due process rights.  <u>See</u> Response at 1.

Gotovac and Bolen argue that '"the nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."' Response at 2 (citing Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). They claim that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms," with one including a "facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction." Response at 2. They assert that this instance is a facial attack, and, thus, they enjoy rule 12(b)(6) safeguards. See Response at 2. Gotovac and Bolen contend that a complaint need not set forth detailed factual allegations but only allegations that might give the Court reason to believe that a plaintiff can muster factual support for the claims in a complaint. See Response at 3 (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)("Iqbal")). Gotovac and Bolen argue that they have established claims for relief if the Court determines that the claims set forth in the Complaint are plausible. See Response at 4.

Gotovac and Bolen further argue that Trejo's acts violate their right to due process, because Trejo did not engage in fair procedures to reach the decision to transfer the horses Woods trained. See Response at 5. They argue that the profession of horse racing is in and of itself a protected property interest and state that "Plaintiffs have a liberty interest in pursuing their profession of horse racing and are entitled to due process of law if they are to be lawfully denied an opportunity to do so." See Response at 6 (quoting Barry v. Barchi, 443 U.S. 55, 64 (1979)). They argue that Trejo violated this protected property interest. See Response at 8. Gotovac and Bolen further argue that horse racing is a protected property interest after Simon v. Taylor, 981 F. Supp. 2d 1020 (D.N.M. 2013)(Browning, J.). See Response ¶ 11, at 7. Gotovac and Bolen distinguish between the present case and Simon v. Taylor, reasoning that Simon v. Taylor was about challenging race results based on cheating and not on a prohibition from participating, that the owner in Simon v.

Taylor was free to participate in his chosen profession, and that there was a remedy given to the plaintiffs afterward.  In contrast, Gotovac and Bolen assert they were denied the right to engage in their chosen profession of horse racing without meaningful process and have no remedy to vindicate their right because of Trejo's actions.  See Response at 7.

Gotovac and Bolen also argue that Trejo deliberately deprived them of their protected property right to engage in horse racing, and so violated their procedural and substantive due process rights.  See Response at 8.  Gotovac and Bolen note that the due process "root requirement" is that "an individual be given an opportunity for a hearing before he is deprived of any significant property interest,"  Response at 8 (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545 (1985)), and that no hearing was held before Trejo's decision, see Response at 8.  According to Gotovac and Bolen's argument, Trejo must provide procedural protections consisting of the opportunity to be heard "at a meaningful time and in a meaningful manner."  Response at 9 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).  Gotovac and Bolen, assert, however, that they are not required to "prove" either of these factors, but rather are required to plead only sufficient facts that demonstrate a protected private interest was affected along with a lack of procedural safeguards to protect the specified property interest.   Response at 9.  Gotovac and Bolen again contend that they had a protected property interest in the profession of horse racing of which a state actor, Trejo, deprived them of their protected property right through unauthorized regulatory action that warranted procedural protections, and thus assert that their due process claim is not subject to dismissal.  See Response at 10.

Gotovac and Bolen argue that they have sufficiently pled that Trejo deprived them of a property right in an arbitrary manner, with arbitrary reasons, by failing to uphold the regulations to withstand dismissal, violating substantive due process.  See Response at 11.  They assert that

the doctrine of substantive due process is based on a "long standing recognition that the due process clause of the United States Constitution 'guarantees more than fair process.'"  Response at 11, (quoting Washington v. Glucksberg, 521 U.S. 702, 719 (1997)).  To further prove a violation of substantive due process, they invoke Seegmiller v. LaVerkin City, 528 F.3d 762 (10th Cir. 2008), which describes the two strands of substantive due process doctrine as "protect[ing] an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience."  Response at 11 (quoting Seegmiller v. LaVerkin City, 528 F.3d at 767.  Gotovac and Bolen argue that they have alleged facts that, if deemed true, allow for their claims to proceed to the merits.  See Response at 12.  Further, Gotovac and Bolen argue that they have "raised facts sufficient to demonstrate that in this instance procedural protections were not provided, Plaintiffs were harmed by the conduct and thus a Constitutional violation was perpetrated."  Response at 12.  They acknowledge that courts are stringent in deciding that an action "shocks the conscience," but Gotovac and Bolen argue that Trejo's arbitrary reinterpretation of the regulation, done in a way to target specific individuals such as themselves, is a sufficiently egregious governmental overreach to qualify as a violation of substantive due process.  Response at 12.  They further argue that the regulation and its interpretation were long-standing, and that therefore everyone who raced in New Mexico was aware of it.  See Response at 13.

Gotovac and Bolen also assert that Trejo denied them equal protection.  See Response at 13.  They argue that they have a liberty interest in horse racing and are "entitled to due process of law if they are to be lawfully denied an opportunity to do so."  Response at 13 (citing Barry v. Barchi, 443 U.S. at 64; State Racing Comm'n v. McManus, 1970-NMSC-134, 476 P.2d 767).  They also put forth that the Equal Protection Clause prohibits state entities from treating similarly situated persons differently.  See Response at 13 (citing Rector City v. City & Cty. of Denver, 348

F.3d 935, 949 (10th Cir. 2003)).  They argue that Trejo purposefully violated applicable law and regulation, which in turn violated their constitutional procedural protections.  See Response at 14. They further argue that the Trejo's actions were applied to "marginalize their rights and give an unfair advantage to a singular horse and trainer."  Response at 14.  Thus, they argue that Trejo violated their equal protection rights.  See Response at 14.  Gotovac and Bolen assert that the Defendant was acting under the "color of state law" and thus meet the equal protection requirement, as Gallagher v. Neil Young Freedom Concert establishes.  Response at 15 (citing Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995)).  They therefore argue that the equal protection arguments' merits are not appropriate for consideration.  See Response at 16.

Gotovac and Bolen also argue against Trejo's qualified immunity assertion.  See Response at 16.  They argue that qualified immunity applies only when conduct has not violated any clearly established statutory or constitutional rights of which a reasonable person should have known.  See Response at 16 (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  Gotovac and Bolen recognize that they must prove that Trejo's actions violated constitutional rights and that the rights were clearly established at the time of the alleged misconduct.  They note that, under Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009), public officials may assert qualified immunity in  a motion to dismiss.  See Response at 17.  Gotovac and Bolen state that the Court has discretion on which of the two prongs to review first.  See Response at 17.  In asserting the qualified immunity defense, they contest again that they have alleged a violation of a constitutional right and that Trejo's actions violate that right.  See Response at 17-18.  They assert that their right to horse racing is a protected property right and that barring them from racing horses without due process is a constitutional violation.  See Response at 18.

To satisfy the second prong, they argue that their property right was sufficiently clear that a reasonable official in Trejo's position "would understand that what he was doing violated Plaintiffs' rights, and Plaintiffs have alleged facts suggesting as much." See Response at 18. They argue that Trejo was aware of the rules and their longstanding interpretation, and that Trejo deliberately ignored those rules and interpretations to exercise discretion, which he applied to only one owner/trainer. See Response at 19. They further assert that he should have known that applying these rules differently would impact individuals in the horse racing profession. See Response at 19. They argue that Trejo did not provide proper notice before changing these rules and that he cannot alter rules as he sees fit. See Response at 19. They argue that reasonable individuals in Trejo's position or who are similarly situated to Trejo's position would have understood that his actions violated Gotovac and Bolen's property interest. See Response at 19. Finally, Gotovac and Bolen argue that qualified immunity does not shield Trejo, because they have argued that their constitutional rights were violated, and "once the plaintiff establishes an inference that the defendants'" conduct violated a clearly established constitutional right, a qualified immunity defense generally fails. See Response at 19 (citing Cannon v. City & Cty. of Denver, 998 F.2d. 867, 870-71 (10th Cir. 1993)).

**4.      Reply**

Trejo replies. See Defendant's Reply in Support of the Motion to Dismiss, filed November 21, 2019 (Doc. 14)("Reply"). Trejo first argues that the courts may grant qualified immunity on the ground that a purported right was not "clearly established" by prior case law, asserting that there must be a Supreme Court of the United States or United States Court of Appeals for the Tenth Circuit decision on point, or that the law outside the Tenth Circuit is unmistakable. Reply at 2

(citing Riechle v. Howards, 566 U.S. 658, 664 (2012), Weise v. Casper, 593 F.3d 1163, 1167 (10th Cir. 2010)).  Trejo argues that Gotovac and Bolen have not made that case.  See Reply at 2.

Trejo then argues that Gotovac and Bolen rely on dicta in a series of cases to support their claim that they were deprived of their constitutionally protected right to engage in their profession of horse racing.  See Reply at 2.  Trejo argues, however, that the cases that Gotovac and Bolen use are substantially different from the case at hand.  See Reply at 3.  Trejo explains that the cases that Gotovac and Bolen cite in the Response, such as Barry v. Barchi and Stinebaugh v. N.M. Racing Comm'n, No. 32,840, 2015 WL 4874288 (N.M. Ct. App. July 9, 2015), all deal with challenges to a license to race horses rather than to the outcome of a particular race or the interpretation of administrative regulations.  See Reply at 3.  He acknowledges that, while these cases observed that a person has a right to engage in horse racing as a profession, this observation was directed specifically towards actions against a person's license, and not to their right to engage in any particular race just based on the general desire to race horses.  See Reply at 3.  Trejo acknowledges that actions taken against a license could run afoul of the Fourteenth Amendment but reiterates that, because Gotovac and Bolen have not alleged any action against a license, the cases set forth in the Response do not establish that he violated a clearly established right.  See Reply at 3.  Trejo further argues that even the case of Simon v. Taylor, though more similar to the current case than other cases Gotovac and Bolen cite, does not create a clearly established right to take place in a particular horse race on a particular day, or that the owner of one horse has any property right after the disqualification of another owner's horse.  See Reply at 4.  Then, Trejo turns to Simon v. Taylor's holding, which determined that "the due process clause is not so broad as to create a property right for second-place finishers or give them a special 'Constitutional' hearing that state law does not give them."  Reply at 4 (quoting Simon v. Taylor 981 F. Supp. 2d 1020).  Trejo

therefore argues that, because Gotovac and Bolen have not identified any case that creates a clear constitutional right to engage in a specific horse race, qualified immunity bars their due process claim.  See Reply at 4.

Trejo then turns to Gotovac and Bolen's substantive due process claims.  See Reply at 4. He reiterates the two forms a substantive due process claim can take -- the violation of an individual's fundamental liberty interests or any form of government conduct that "shocks the conscience."  Reply at 4 (citing Milner v. Mares, No. CIV 17-0254 KG/LF, 2017 WL 5151311, at *5 (D.N.M. Nov. 3, 2017)(Gonzales, J.)).  Trejo argues, on the first point, that "only fundamental rights and liberties which are deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty qualify. . . protection."  Reply at 5 (quoting Chavez v. Martinez, 538 U.S. 760, 775 (2003), and citing Seegmiller v. LaVerkin City, 528 F. 3d at 767).   He denies Gotovac and Bolen's argument that they were required to use special words or phrases to invoke either doctrine, and he denies he made arguments about these claims' merits.  See Reply at 5.  Trejo contends that a competing interpretation of the rules, by itself, cannot shock the conscience of the judiciary.  See Reply at 5.  Trejo therefore argues that Gotovac and Bolen have not pled any facts that demonstrate a violation of substantive due process.  See Reply at 6.  Trejo also discusses Milner v. Mares, in which an NMAC regulation was found not to violate substantive due process. See Reply at 5 (citing Milner v. Mares, 2017 WL 5151311, at *5).  He again asserts that Gotovac and Bolen's interpretation of the rules has no precedential value and that they have failed to explain how an administrative act, which that Trejo argues was permitted, violates due process.  See Reply at 6.

Finally, Trejo addresses the equal protection claim.  He argues that "equal protection jurisprudence has traditionally been concerned with governmental action that disproportionately

burdens certain classes of citizens," along with stating that "a plaintiff must show that she was treated differently from others who were similarly situated."  <u>See</u> Reply at 6 (citing <u>Kan. Penn Gaming, LLC v. Collins</u>, 656 F.3d 1210, 1215-16 (10th Cir. 2011); <u>Taylor v. Roswell Indep. Sch. Dist.</u>, 713 F.3d 25, 53 (10th Cir. 2013)).  Trejo contends that, because Gotovac and Bolen do not assert that they were in a protected class, they can sustain only an equal protection claim under a "class of one" theory, which applies only when a plaintiff alleges that they have been intentionally treated differently than someone else who is similarly situated with no rational basis.  Reply at 6 (citing <u>Vill. of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000)).  According to Trejo, Gotovac and Bolen do not explain how the decision to allow the horses to transfer was different treatment from all other similarly situated owners. They do not identify any owners who were not allowed to transfer to other owners under the same circumstances, or whose horses tested positive for a controlled substance but were not able to be transferred.  <u>See</u> Reply at 7.  Trejo therefore asserts that, because they have not asserted that they were treated differently than others similarly situated, the equal protection claim is unsustainable.  <u>See</u> Reply at 7.  Furthermore, Trejo reasons that, even if Gotovac and Bolen identify disparate treatment, the stated reason for the transfer -- an administrative delay -- is an objectively justifiable reason to allow a transfer.  <u>See</u> Reply at 7.  Trejo therefore concludes that, because Gotovac and Bolen do not plead sufficient facts to prove they were treated differently than others who were similarly situated, and because the facts that are alleged show an objectively reasonable reason for transfer, qualified immunity bars their equal protection claims.  <u>See</u> Reply at 7.

5.        **The Hearing**.

The Court held a hearing on the Motion on December 3, 2019.  See Transcript of Hearing at 1:22-25 (taken December 3, 2019)(Court)("Tr.").[8]  Trejo first provided the case's facts.  See Tr. at 3:2-9:22 (Bebeau, Court).  He told the Court that Trejo had authorized transfers of the horses at issue in this case, because Woods' suspension should have been processed on August 7, 2019, and, if it had been processed on that date instead of August 9, 2019, the horses would have been able to transfer to different trainers.  See Tr. at 3:2-9:22 (Bebeau, Court).  He said that the NMRC's bar on transfers may be lifted if the transfer does not evade the NMRC's rules.  See Tr. at 9:23-10:7 (Bebeau).  Trejo argued that he had not violated a concrete property right.  See Tr. at 12:7-16 (Bebeau).

Gotovac and Bolen then made an opening statement.  See Tr. at 13:3-4 (Dunn).  They first cited N.M. Stat. Ann. § 60-1A-5 and NMAC §§ 15.2.1.10, 15.2.1.9(b)(8), and 15.2.5.12, and they argued that "if the executive director was following the rules promulgated by the commission . . . those horses are ineligible no matter what."  Tr. at 14:23-15:1 (Dunn).  The Court pivoted to Trejo to ask what part of the regulations entitle Trejo to act broadly.  See Tr. 15:12-15 (Court).  Trejo responded that, although he did not have the citation off the top of his head, the NMAC allows the executive director of the NMRC to carry out duties that the NMRC delegated.  See Tr. at 15:16-24 (Bebeau).  Gotovac and Bolen analogized this situation to a hypothetical scenario where the government licenses National Football League players, and it declines to suspend a quarterback caught doping because there was a chance he would play in the Super Bowl that year. See Tr. at 17:1-18:7 (Court, Dunn).

---

[8]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Trejo first addressed Gotovac and Bolen's procedural due process arguments.  See Tr. at 19:21-22 (Bebeau).  Trejo argued that Gotovac and Bolen are not entitled to an interpretation of the NMAC in a way they prefer, and the Court does not need to interpret the Code itself, because there is no property interest in the NMAC's interpretation according to the Tenth Circuit's opinion in Milner v. Mares.  See Tr. at 20:5-20 (Bebeau)(citing Milner v. Mares, 754 F. App'x 777 (10th Cir. 2019)(unpublished)).  Trejo said that Gotovac and Bolen rely on cases stating that there is a property right to practice the horse racing profession.  See Tr. at 21:3-21 (Bebeau).  But he argued that there is no right to engage in a particular horse race.  See Tr. at 21:22-25 (Bebeau).  The Court then asked how there could be "a property interest in a license but not a property interest in having a slot in a race."  Tr. at 22:3-5 (Court).  Trejo replied that the license is a property interest granted by the state following an application process, and the property interest is used and allowed by the New Mexico Horse Racing Act and the NMAC to regulate who is allowed to race.  See Tr. at 22:9-12 (Bebeau).  He noted that "in Milner v. Mares the NMAC allowed the scratching of a horse before a race and ultimately found that there was no property interest in the interpretation of a NMAC provision that would have allowed a horse to enter in a particular race on a particular day."  Tr. at 24:15-21 (Bebeau).  The Court stated that it would probably have to interpret the NMAC to determine whether Trejo's interpretation was reasonable.  See Tr. at 25:11-23 (Court).

Gotovac and Bolen then summarized the property interest they allege as, "a property interest [in] engaging in their chosen . . . profession of horse racing and derivative of that is the opportunity . . . to engage in that profession in a fair manner," Tr. at 28:10-15 (Dunn).  See id. at 28:18-19 (Dunn)("Yes, it is the opportunity to race in a fair manner.").  The Court asked if Gotovac and Bolen's horse had come in first place, whether the state would have deprived them of anything.  See Tr. at 29:10-11 (Court).  Gotovac and Bolen responded "no," Tr. at 29:12 (Dunn),

but asserted that the state deprived them of the opportunity to fairly compete, because Trejo allowed a banned trainer's horses to compete and because Trejo cannot lawfully change the rules or make exceptions as he sees fit, see Tr. at 29:19-30:12 (Dunn). The Court suggested that Trejo "could just sit there and say you know this is fair and as long as it's got some rational basis. . . he could do what he wanted," Tr. at 31:21-25 (Court), and Gotovac and Bolen replied that that is Trejo's argument, see Tr. at 32:1-3 (Dunn). However, Gotovac and Bolen stated that Trejo does not have the delegated authority to override the rules to decide what is fair and to excuse people whom he likes from the rules. See Tr. at 32:5-15 (Dunn).

Trejo answered he had not changed the rules or their language; it was simply an interpretation of the rules on that particular day. See Tr. at 33:2-8 (Bebeau). The Court then asked for the interpretation of the rules before and after August 9, 2019. See 33:11-14 (Court). Trejo stated he did not know NMAC § 15.1.2B.8's interpretation before August 9, 2019, but he said the interpretation now is that "a horse can be transferred if it is not to circumvent intent of the ruling." Tr. at 34: 1-7 (Bebeau). He said that, in this case, there was no direct or indirect training or ownership by a disqualified person. See Tr. at 34:9-16 (Bebeau). Once the horse was transferred, Trejo said that "the disqualified trainer Mr. Woods was no longer the trainer." Tr. at 35:1-3 (Bebeau).

The Court then moved to the substantive due process issue. See Tr. at 35:5-6 (Court). Trejo argued that "[t]o state a substantive due process violation, plaintiffs must allege a violation of a fundamental liberty interest, or some government conduct that shocks the conscience." Tr. at 35:9-12 (Bebeau). Trejo said that there is no fundamental liberty interest in the interpretation of the NMAC racing rule and that nothing about Trejo's conduct shocks the conscience. See Tr. at 36:23-36:11 (Bebeau). Gotovac and Bolen agreed with the Court that their procedural due process

argument is stronger.  See Tr. at 37:24-25 (Dunn).  They only briefly argued that, "if this is an issue of corruption," Trejo acted deliberately indifferently in a way that violated their substantive due process rights.  Tr. at 38:3-4 (Dunn).

Regarding the equal protection claim, Trejo argued that, because Gotovac and Bolen do not claim that they are in a protected class, they must allege that they were treated differently than somebody who was similarly situated to them, that this treatment was irrational, and that it was wholly unrelated to legitimate state activity.  See Tr. at 39:16-40:5 (Bebeau).  Trejo stated that Gotovac and Bolen have not shown this treatment, because they have not shown that a horse that they owned or trained was forbidden from transferring or starting under similar facts, see Tr. at 40:6-9 (Bebeau), and that the facts show that there was a legitimate government interest underling his actions, see Tr. at 40:9-15 (Bebeau).

Gotovac and Bolen responded that their claim is based on Woods' special, preferred treatment.  See Tr. at 41:3-7 (Dunn).  In this way, Gotovac and Bolen argue that they have an "inverse" equal protection claim.  See Tr. at 40:24-25 (Dunn).  The Court stated:

> I assume when Trejo did what he did he wasn't thinking about your horse he was just thinking about the horse he was putting in the race.  So he wasn't singling out your horse for any particular attributes or anything like that.  He was preferring another horse and giving him a break, that's about the best you can argue, right?

Tr. at 42:5-12 (Court).  Gotovac and Bolen agreed. See Tr. at 42:8-13 (Dunn).  They argued that, similar to Milner v. Mares, "when you excuse somebody from the rules . . . you are taking and singling out everybody else that competed fairly."  Tr. at 43:20-22 (Dunn).  Trejo responded that Gotovac and Bolen are essentially arguing that people who get tickets for running a red light should be able allege equal protection violations whenever someone runs a red light and is let off with a warning.  See Tr. at 44:5-15 (Bebeau).

The Court asked each party to identify the most analogous due process case.  See Tr. at 45:14-19 (Court).   Trejo provided Barry v. Barchi and Stinebaugh v. New Mexico Racing Commission, and he stated that no Supreme Court case stands for the proposition that individuals have a generalized right to engage in horse racing.  See Tr. at 45:20-24 (Bebeau); id. at 46:8-12 (Bebeau).  Gotovac and Bolen stated that those two cases and State Racing Commission v. McManus are applicable.  See Tr. at 47:12-13 (Dunn).  They said that they "couldn't find anything" on point for their Equal Protection Clause argument.  See Tr. at 49:17-25 (Dunn).

The Court asked for Trejo's final words.  See Tr. at 50:2-3 (Court).  Trejo stated that, in addition to not showing that Trejo violated any clearly established rights, Gotovac and Bolen wanted to impose an "unworkable" standard under which every single horse racing licensee is entitled to due process in disciplinary standards.   Tr. at 50:15 (Bebeau).  See id. at 50:5-19 (Bebeau).  Gotovac and Bolen replied that "when the Commission fails to follow its own procedures" and "when it fails to follow the regulations that it promulgated that that is a due process violation."  Tr. at 51:3-5 (Dunn).  They argued that Trejo acted unfairly in allowing someone who cheated to profit and stated that this action was arbitrary and capricious.  See Tr. at 51:14-24 (Dunn).  They stated that they have a protected property interest in competing fairly and were deprived of that opportunity.  See Tr. at 52:5-12 (Dunn),

> The Court concluded:
>
> I don't think there is a substantive due process claim here and I don't think there is an equal protection claim.  I just don't think this shocks the conscience enough, and I'm having a hard time coming up with any sort of class that has a cognizable damage here so I'm not sure I can fashion any sort of substantive due process or equal protection claim.

Tr. at 54:2-9 (Court).  The Court stated that it would review Gotovac and Bolen's procedural due process and property interest arguments.  See Tr. at 54:9-10 (Court).  It also indicated that it was unlikely that Gotovac and Bolen's claims would survive the Motion.  See Tr. at 54:13-15 (Court).

6.      <u>**The First Notice**</u>.

After the hearing, Gotovac and Bolen alerted the Court to additional matters in the case. <u>See</u> Plaintiffs' Notice of Supplemental Authority, filed January 16, 2020 (Doc. 18)("First Notice"). In the First Notice, Gotovac and Bolen included the NMRC's final ruling on Woods. <u>See</u> First Notice at 1.  The NMRC's ruling enumerates Woods' penalties, which include a one-and-a-half year suspension of Woods' NMRC licenses and a $15,000.00 fine to be paid on or before February 14, 2020.  <u>See</u> First Notice at 3.  The ruling also stated that Woods was excluded from all areas of the grounds under The NMRC's jurisdiction.  <u>See</u> First Notice at 3.  Additionally, it states that effective upon applicable suspension dates, all horses owned, trained, or under Woods' care are ineligible to race, and any transfer or sale of his horses "must be done in accordance with 15.2.6.9A(12)(a)(b) Medication and Prohibited Substances, 16.47.1.10 (D)(5) Assistant Trainers and 15.2.1.9(B)(8)(b) DUE PROCESS AND DISCIPLINARY ACTION."  First Notice at 3.

7.      <u>**Second Notice**</u>.

More recently, Gotovac and Bolen filed a second notice.  <u>See</u> Plaintiffs' 2nd Notice of Supplemental Authority, filed June 22, 2020 (Doc. 19)("Second Notice").  The Second Notice alerts the Court to an NMRC ruling where a trainer, Janell Sanderson, was summarily suspended for failure to comply with the NMRC's order for out-of-competition testing, which was conducted on June 11, 2020.  <u>See</u> Second Notice at 3.  Due to Sanderson's failure to comply, Sanderson's horses were deemed ineligible to race, and all transfer or sale of horses trained, owned, or under her care and custody had to be done in accordance with NMAC rules.  <u>See</u> Second Notice at 3.

### LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d at 340.  A court may also consider documents to which the complaint refers, if their adequacy is central to the plaintiffs' claims and their authenticity is unquestioned.  See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the court properly considered notices attached to the motion and not to the complaint, because the complaint referenced them, their adequacy was central to the plaintiffs' claims, and their authenticity was unquestioned).  GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered[.]").

A complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir.

2006))).  At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face."  Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Iqbal, 556 U.S. at  678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).  See Duncan v. Citibank (S.D.), N.A., No. CIV 06-0246 JB/KBM, 2006 WL 4063021, at *3 (D.N.M. June 30, 2006)(Browning, J.)(dismissing a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") cause of action from a complaint where the complaint alleged a single physical act, and not a pattern of racketeering activity, and a pattern of activity is one of the elements required to state a RICO claim).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the

complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  A court will not construe a plaintiff's pleadings "so liberally that it becomes his advocate."  Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.).  The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."  The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(internal citations omitted).  See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

Generally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v. Ulibarri, 595 F.3d at 1125.  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004) states: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint.  The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint."  91 F. App'x at 85.[9]  There are three limited exceptions to this general principle: (i) documents that

---

[9]Carter v. Daniels is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value").  The Tenth Circuit has stated:

> "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored.... However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."

the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that,

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Carter v. Daniels; Nard v. City of Okla. City, 153 F. App'x 529 (10th Cir. 2005); Marino v. Mayger, 118 F. App'x 393 (10th Cir. 2004); Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011); Choate v. Huff, 773 F. App'x 484 (10th Cir. 2019); Rife v. Jefferson, 742 F. App'x 377 (10th Cir. 2018); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552 (10th Cir. 2017); Brown v. City of Colo. Springs, 709 F. App'x 906 (10th Cir. 2017); and Milner v. Mares, 754 F. App'x 777 (10th Cir. 2019), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

"[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005). The Court has previously ruled that, when a plaintiff references and summarizes the defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired. See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents. See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action and as an exception to the general rule, the Court has concluded that the Court may consider a defendant's operating certification, to which plaintiffs refer in their complaint, and which is central to whether the plaintiffs adequately allege

a loss, when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.; SEC v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, emails referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir.

2006)(quoting <u>Clark v. City of Draper</u>, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. 564, 570-71 (1972). "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 571 (quoting <u>Nat'l Mutual Ins. Co. v. Tidewater Transfer Co.</u>, 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)). The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 571-72. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

<u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 572. "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired

in specific benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576. These property

interests, as already explained, clearly can include "real estate, chattels, or money," but they "may

take many forms." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory
> and administrative standards defining eligibility for them has an interest in
> continued receipt of those benefits that is safeguarded by procedural due process.
> Goldberg v. Kelly, 397 U.S. 254 . . . [(1970)]. See Flemming v. Nestor, 363 U.S.
> 603, 611 . . . [(1960)]. Similarly, in the area of employment, the Court has held that
> a public college professor dismissed from an office held under tenure provisions,
> Slochower v. Bd. of Education, 350 U.S. 551 . . . [(1956)], and college professors
> and staff members dismissed during the terms of their contracts, Wieman v.
> Updegraff, 344 U.S. 183 . . . [(1952)], have interests in continued employment that
> are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly

must have more than an abstract need or desire for it. He must have more than a unilateral

expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents

of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause

of the Constitution itself, but is created by independent sources such as a state or federal statute, a

municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d

1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property]

interests attain . . . constitutional status by virtue of the fact that they have been initially recognized

and protected by state law."). "Property interests, of course, are not created by the Constitution.

Rather they are created and their dimensions are defined by existing rules or understandings that

stem from an independent source such as state law-rules or understandings that secure certain

benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls.

v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir.

1994)("Rather, property interests, which are the subject of the present litigation, 'are created and

their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 541 (citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. at 334. The Supreme Court has explained that

> the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest. This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545(footnote omitted).

The United States Court of Appeals for the Second Circuit has stated:

> The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] . . . (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335, 96 S. Ct. 893). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335. . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has previously considered procedural due process violations several times.  For example, in A.M. through Youngers v. N.M. Dep't of Health, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.), the Court concluded that the New Mexico Department of Health violated due process when it afforded a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement.  See A.M. through Youngers v. N.M Dep't of Health, 2015 WL 13668431, at *37-43.  The Court has also concluded that a tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").  See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d 1180, 1215 (denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers"); Camuglia v.

City of Albuquerque, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.), aff'd,
Camuglia v. City of Albuquerque, 448 F.3d at 1220-21 ("[I]t cannot be denied that the City, acting
through its inspectors, may close a restaurant to protect the health of patrons and workers without
first providing a hearing to the restaurant owner.").

## LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive
any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.
In general, state actors may be held liable under § 1983 only for their own affirmative acts that
violate a plaintiff's due-process rights and not for third parties' acts.  See Robbins v. Oklahoma,
519 F.3d at 1251 (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189,
197)(1989).  "[N]othing in the language of the Due Process Clause itself requires the State to
protect the life, liberty and property of its citizens against invasion by private actors."  DeShaney
v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause is not a
guarantee of a minimal level of safety and security.  See DeShaney v. Winnebago Cty. Dep't of
Soc. Servs., 489 U.S. at 195.

### 1.     Exceptions to the General Rule.

There are, however, two exceptions to this general rule.  The first exception -- the special-
relationship doctrine -- arises when the state has a custodial relationship with the victim, which
triggers an affirmative duty to provide protection to that individual.  See Christiansen v. City of
Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991,
994-95 (10th Cir. 1994).  The second exception -- the danger-creation theory -- provides that a
state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to
create, or increases a plaintiff's vulnerability to, or danger from private violence.'"  Robbins v.

Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d at 923).   "If either the special- relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience."  Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)("The shocks the conscience standard applies to both types of suits.")).

### 2.   **Special-Relationship Exception**.

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the Due Process Clause is the special-relationship doctrine. A plaintiff must show that he or she was involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine.  See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient)."  Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995).

### 3.   **Danger-Creation Exception**.

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct."  Uhlrig v. Harder, 64 F.3d at 573.  The danger-creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."  Currier v. Doran, 242 F.3d at 923.  See Estate of B.I.C. v. Gillen, 702 F.3d 1182, 1187 (10th Cir. 2012)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm.").  Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm"

or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573.  A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'" Estate of B.I.C. v. Gillen, 702 F.3d at 1187 (quoting Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)).  To state a prima facie case, the plaintiff must show that his or her danger-creation claim for due process violations meets a six-part test: (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; and (v) the defendant must have acted recklessly in conscious disregard of that risk.  See Peña v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v. City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk." Medina v. City & Cty. of Denver, 960 F.2d at 1496.  The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences." Medina v. City & Cty. of Denver, 960 F.2d at 1496 (citations omitted).

4.      **What Shocks the Conscience**.

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.  See Cty. of Sacramento v. Lewis, 523 U.S. at 849)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").  "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power."  Camuglia v. City of Albuquerque, 448 F.3d at 1222 (internal quotation marks omitted)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)).  "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (internal quotation marks omitted)(quoting Uhlrig v. Harder, 64 F.3d at 574).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge."  Peña v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer

sued the director, deputy director, warden, and deputy wardens of the department of corrections,

alleging that the defendants deliberately failed to ensure proper training and supervision of

penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective

action to protect her husband, all of which resulted in him being killed during the escape of three

inmates.  See 265 F.3d at 1132.  The district court concluded that the plaintiff failed to state a

§ 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the

defendants' actions were "not of such a magnitude that the Court is able to conclude they shock

the conscience."  265 F.3d at 1134.  The Tenth Circuit agreed with the district court's conclusion,

stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks is

not enough to satisfy the danger-creation theory's conscience shocking standard."  265 F.3d

at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M.

2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district, superintendent,

principal, and vice principal of a middle school -- violated the plaintiffs' substantive due process

rights when they did not take sufficient action to prevent a student at the school from "racking"[10]

the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court concluded that the defendants' conduct

did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants
> were aware of three instances of an unknown eighth-grade student racking various
> sixth-grade students within the span of a month, and failed to implement policies
> to improve hallway monitoring and stop this conduct from occurring in time to
> prevent [the plaintiffs' son] from falling victim to the same fate.  Further, the

---

[10]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as
being "kicked and/or punched in the testicles."   716 F. Supp. 2d at 1059 n.2 (citations
omitted)(internal quotation marks omitted).

Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .

Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING EQUAL-PROTECTION CLASS-OF-ONE CLAIMS

The Equal Protection Clause of the Fourteenth Amendment guarantees that "no states shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  "The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'"  Soskin v. Reinertson, 353 F.3d 1242, 1247 (10th Cir. 2004)(quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)). See Corder v. Lewis Palmer Sch. Dist. No. 38, 566 F.3d 1219, 1233 (10th Cir. 2009)("Equal protection 'is essentially a direction that all persons similarly situated should be treated alike.'")(quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).

### 1.     The Substantive Law of Class-of-One Claims.

The Supreme Court has "recognized successful equal protection claims brought by a class of one, where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Willowbrook v. Olech, 528 U.S. at 564.  Class-of-one cases have presented a challenge to the lower courts since the Supreme Court established the doctrine in Willowbrook v. Olech.  See Jennings v. City of

Stillwater, 383 F.3d at 1211.  The lower courts have recognized the risk that, "unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors." Jennings v. City of Stillwater, 383 F.3d at 1211-12. The Tenth Circuit recognized in Jennings v. City of Stillwater that it is nearly always possible for persons aggrieved by a government action to produce evidence of being treated differently than others and that it is always possible to allege such differential treatment.  See Jennings v. City of Stillwater, 383 F.3d at 1211-12.

Recognizing the potentially unlimited nature of the claim, the Courts of Appeals have "proceeded cautiously in applying this theory."  Jicarilla Apache Nation v. Rio Arriba Cty., 440 F.3d 1202, 1209 (10th Cir. 2006). The Tenth Circuit in Jicarilla Apache Nation v. Rio Arriba County cautioned that "[a]n approach that reads Olech too broadly could transform the federal courts into general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system."  Jicarilla Apache Nation v. Rio Arriba Cty., 440 F.3d at 1209 (citing Jennings v. City of Stillwater)(internal quotation marks omitted).  In keeping with these concerns, the Tenth Circuit requires that a plaintiff must first establish that others, "similarly situated in every material respect" were treated differently to prevail.  Jicarilla Apache Nation v. Rio Arriba Cty., 440 F.3d at 1210.  "A plaintiff must then show this difference in treatment was without rational basis, that is, the government action was 'irrational and abusive,' and 'wholly unrelated to any legitimate state activity.'"  Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1216 (quoting Mimics, Inc. v. Vill. of Angel Fire, 394 F.3d 836, 849 (10th Cir. 2005)).  Courts do not

inquire into the government actor's actual motivations.  Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1216.[11]

The Tenth Circuit has noted: "'The paradigmatic 'class of one' case, sensibly conceived, is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen.'"  Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1216 (internal alteration omitted)(quoting Lauth v. McCollum, 424 F.3d 631, 633 (7th Cir. 2005)(Posner, J.)).  "Successful claims have arisen from unfavorable zoning decisions, withholding of permits, and selective regulatory enforcement."  Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1216 (internal citations omitted).  The Supreme Court has also held that "the class-of-one theory of equal protection has

_____

[11]There appears to have been some confusion regarding whether the Tenth Circuit requires a plaintiff to allege some degree of animus as well.  Although earlier Tenth Circuit opinions suggested that a plaintiff must prove some degree of animus, see Mimics, Inc. v. Village of Angel Fire, 394 F.3d at 849 (stating that plaintiffs "must prove that they were singled out for persecution due to some animosity" (internal quotation marks omitted)), the Tenth Circuit subsequently treated the issue as an open question, see Jicarilla Apache Nation v. Rio Arriba Cty., 440 F.3d at 1209-10, and the quoted language from Kansas Penn Gaming, LLC v. Collins supports an objective standard -- not an inquiry into subjective culpability.  As the Honorable John E. Dowdell, United States District Judge for the Northern District of Oklahoma, stated when considering a motion to dismiss for failure to state a claim under rule 12(b)(6):

> [T]he Collins court omitted the animosity language found in Mimics and reiterated that the standard is an *objective* one.  Given the Collins court's emphasis on the "objective" nature of the inquiry, and the logic thereof, the Court declines to impose a requirement that the plaintiffs make a showing of ill will or animosity . . . .

Sutherlin v. Indep. Sch. Dist. No. 40 of Nowata Cty., Okla. No. 12-CV-636-JED-PJC, 2013 WL 1975644, at *5 n. 3 (D. Okla. May 13, 2013)(Dowdell, J.)(emphasis in original).  The Court acknowledges its past statement that "[t]o show a constitutional violation under the 'class of one' theory," the plaintiff must prove "that the Defendants acted with discriminatory intent" in Kelley v. City of Albuquerque, 375 F.Supp.2d 1183, 1205 (D.N.M. 2004)(Browning, J.). That statement preceded both Jicarilla Apache Nation v. Rio Arriba County and Kansas Penn Gaming, LLC v. Collins, and the Court agrees with Judge Dowdell's description of the Tenth Circuit's evolution in this regard.  The Court will not, therefore, require a showing of animosity to sustain a class-of-one claim.

no application in the public employment context." Engquist v. Or. Dep't of Agric., 553 U.S. 591, 607-08 (2008)(reasoning that "an allegation of arbitrary differential treatment could be made in nearly every instance" of a personnel decision by the government and that "government offices could not function if every employment decision became a constitutional matter"). See Kelley v. City of Albuquerque, 542 F.3d 802, 821 (10th Cir. 2008)("[T]he class-of-one theory is not legally cognizable where . . . a public employee claims that she has been treated differently than other employees."); Duprey v. Twelfth Judicial Dist. Court, No. CIV 08-0756 JB, 2009 WL 2105955, at *5 (D.N.M. June 22, 2009)(Browning, J.)("In this case, Duprey, who is a public employee, is alleging that she was denied a promotion and was demoted. Because her lawsuit arises in the public-employee context, she cannot proceed on the class-of-one theory.").

### 2. The Similarly Situated Individual Pleading Requirement for Class-of-One Claims or Claims Based on Membership in a Non-Protected Class.

"Equal protection jurisprudence has traditionally been concerned with governmental action that disproportionally burdens certain classes of citizens." Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1215-16. A plaintiff alleging disparate-treatment discrimination based on membership in a non-protected class or in a class of one must therefore allege in the complaint that similarly situated persons were treated differently. See Brown v. Montoya, 662 F.3d at 1173 ("The pleading requirement of an allegation that a similarly situated person was treated differently applies both when the plaintiff challenges a government action that discriminates based on membership in a non-protected class, or membership in a 'class of one.'")(internal citations omitted)(citing PriceCornelison v. Brooks, 524 F.3d 1103, 1120 (10th Cir. 2008)); Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1216). As the Supreme Court set forth in Village of Willowbrook v. Olech, a plaintiff may bring a class-of-one equal-protection claim, alleging that the plaintiff "has been intentionally treated differently from others similarly situated and that there is no rational basis for

the difference in treatment."  528 U.S. at 564 (citing Sioux City Bridge Co. v. Dakota Cty., 260

U.S. 441 (1923); Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty., 488 U.S. 336

(1989)).  Similarly, discrimination against members of a non-protected class, such as whites,

violates the Equal Protection Clause.  See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273,

279-80 (1976)(holding that Title VII "proscribe[s] racial discrimination in private employment

against whites on the same terms as racial discrimination against nonwhites."); Newport News

Shipbuilding & Dry Dock Co. v. E.E.O.C., 462 U.S. 669, 676 (1983)(extending this proposition

to Equal Protection Clause violations); Reynolds v. Sch. Dist. No. 1, Denver, 69 F.3d 1523, 1532

& n. 10 (10th Cir. 1995)(recognizing that the Equal Protection Clause proscribes discrimination

against whites).

     The law of equal protection traditionally deals with "groups unified by the characteristic

alleged to be the root of the discrimination."  Jennings v. City of Stillwater, 383 F.3d at 1213.

Where a group is involved, the problem is simplified; in this traditional situation, "the sample size

is large enough to raise a concern that the disfavored class was selected . . . because of their

membership in the class."  Jennings v. City of Stillwater, 383 F.3d at 1213.  A unique feature of

the class-of-one claim is that it essentially exempts plaintiffs from proving membership in one of

these groups; rather, they need prove only that he or she is "similarly situated" to other individuals

or entities who have been treated more favorably.  Addressing this unique characteristic of these

claims, the Tenth Circuit in Jennings v. City of Stillwater noted that "[i]t is therefore imperative

for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred

treatment of the favored class."  383 F .3d at 1214.

     Therefore, in class-of-one claims, where discrimination is not alleged against a class of

persons, "[t]he allegation that a plaintiff was treated differently from those similarly situated is an

essential element of an equal protection action."  Hennigh v. City of Shawnee, 155 F.3d 1249, 1257 (10th Cir. 1998)(holding that the plaintiff who alleged he "was subjected to discipline and a disciplinary proceeding *not applicable to any other police officer* under the Collective Bargaining Agreement," but not alleging any class-based discrimination, failed to state a claim, as the "Plaintiff did not show how he was treated differently from others similarly situated" (emphasis added))(citing Norton v. Vill. of Corrales, 103 F.3d 928, 933 (10th Cir. 1996)).  In Norton v. Village of Corrales, for instance, where the Tenth Circuit concluded that "it is clear that they are not claiming unequal treatment on the basis of race, sex or other classifications which require heightened scrutiny," the Tenth Circuit dismissed the complaint, noting that the "Plaintiffs did not explicitly allege they were treated differently from similarly situated persons or corporations."  103 F.3d at 933 (emphasis added).

The Court has quoted this proposition of law -- "[t]he allegation that a plaintiff was treated differently from those similarly situated is an essential element of an equal protection action," Hennigh v. City of Shawnee, 155 F.3d 1249 -- in the § 1983 employment-discrimination context where the plaintiff alleged that the defendant discriminated against him based on his race.  See Gerald v. Locksley, 785 F. Supp. 2d at 1085, 1133.  The Court in that case had before it an equal protection claim which was, at least in part, a class-of-one equal protection claim, and the cases upon which the Court relied were limited to class-of-one equal-protection claims. See Gerald v. Locksley, 785 F. Supp. 2d at 1133 ("Gerald's failure to allege that he was treated differently than others similarly situated also defeats his Equal-Protection claim.")(citing Marino v. Mayger, 118 F. App'x 393, 399 (10th Cir. 2004)(upholding court's dismissal of the plaintiffs' class-of-one claim for the plaintiffs' failure to "specifically allege that the sheriff treated them differently from similarly situated landowners" by refusing to "enforce the restraining orders" against the

defendants); Jennings v. City of Stillwater, 383 F.3d at 1213 (upholding summary judgment in favor of defendants on the plaintiff's class-of-one equal-protection claim, noting that "she failed to make an adequate showing that similarly situated persons were treated differently")).

The Tenth Circuit has adhered to the proposition that, at the summary judgment stage, class based disparate-treatment discrimination claims are subject to the same legal analysis whether based on an equal-protection violation or Title VII violation. See, e.g., Etsitty v. Utah Transit Auth., 502 F.3d 1215, 1227 (10th Cir. 2007)("In disparate-treatment discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII."). Showing disparate treatment of similarly situated individuals, while necessary for class-of-one claims and claims where the plaintiff is not a protected-class member, and while sufficient evidence of discrimination to meet the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), class-based prima facie case, is not necessary for class-based equal protection claims. See Sorbo v. United Parcel Serv., 432 F.3d at 1173 (noting that the McDonnell Douglass Corp. v. Green class-based prima facie case requirement that the adverse action be taken in circumstances giving rise to an inference of discrimination "may be (and often is) satisfied by proof that the employer treated similarly situated employees more favorably, such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case"). See Hunt v. Cent. Consol. Sch. Dist., No. CIV 11-1144 JB/WDS, 2013 WL 3214928, at *32-34 (D.N.M. June 12, 2013)(Browning, J.)(discussing the McDonnell Douglas Corp v. Green framework's requirement that that "a prima facie case of discrimination must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination" (internal quotation marks omitted)). Accordingly, it is also not

necessary for a plaintiff in a protected class pleading a class-based equal protection claim, to allege that similarly situated individuals were treated differently.

In Southwest Media Mobile, LLC v. City of Rio Rancho, No. CIV 13-0248 JB/KBM, 2013 WL 6920856 (D.N.M. Dec. 31, 2013)(Browning, J.), the Court granted summary judgment against a plaintiff alleging a class-of-one equal protection claim.  See 2013 WL 6920856, at *28.  The plaintiff, a mobile sign company, see 2013 WL 6920856, at *3, alleged an equal protection claim against Rio Rancho for passing a city ordinance restricting the use of signs, see 2013 WL 6920856, at *2.  The Court concluded that the plaintiff could not show that similarly situated parties were treated differently, and that, just because "Southwest Media lacks competitors does not render Rio Rancho's attempt to regulate it produces a violation of the Equal Protection Clause."  2013 WL 6920856, at *29.  The Court also found justifiable reasons for the ordinance, concluding that the city's "aesthetics and traffic safety" concerns demonstrated that the ordinance had a rational basis. 2013 WL 6920856, at *30-31.  See also McGuire v. Nielsen, No. CIV 17-1208 JB\LF, 2020 WL 1332582 (D.N.M. March 23, 2020)(Browning, J.).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  Under § 1983, a plaintiff may seek money damages from government officials who have violated his or her

constitutional or statutory rights.  To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. at 818.

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d at 1107; Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

### 1.    Procedural Approach to Qualified Immunity.

The Supreme Court has provided the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular

case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, Saucier v. Katz' protocol -- by which a court first decides if the defendant's actions violated the Constitution and then determines if the right violated was clearly established -- will often be beneficial. See Pearson v. Callahan, 555 U.S. at 241. In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and Courts of Appeals with "what may seem to be an essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted). See Reichle v. Howards, 566 U.S. at 664 (affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[12] the clearly established prong of the qualified immunity analysis: when (i) the first,

---

[12]In Camreta v. Greene, the Supreme Court, somewhat confusingly, states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707. In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), the Tenth Circuit interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See Kerns v. Bader, 663 F.3d at 1180-81. The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018). This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "'it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.'" Kerns v. Bader, 663 F.3d at 1180-81 (quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-07. See Kerns v. Bader, 663 F.3d at 1181.[13] "Courts

---

[13]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.   See Sanchez v. Labate, 564 F. App'x 371, 372 (10th Cir. 2014)("If dispositive of the claim, we ordinarily need address only the second element of qualified immunity, that is, whether the law supporting a constitutional violation was clearly established." (citing Kerns v. Bader, 663 F.3d at 1180)).  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5.

The Tenth Circuit does not always undertake the "clearly established" analysis before the constitutional violation analysis.   See, e.g., Savage v. Troutt, 774 F. App'x 574, 579 (10th Cir.2019)(unpublished);   Rudnick v. Raemisch,   774 F. App'x 446, 449 (10ᵗʰ Cir. 2019)(unpublished); Serrano v. United States, 766 F. App'x at 565.  Since Kerns v. Bader, the Tenth Circuit has commented:

> Although it is within the court's sound discretion to determine which of the two elements to address first, Pearson, 555 U.S. at 236 . . . , "the Supreme Court has recently instructed that courts should proceed directly to, 'should address only,' and should deny relief exclusively based on the second element" in certain circumstances,  Kerns, 663 F.3d at 1180 (quoting Camreta v. Greene, 563 U.S. [at] 707 . . . .)).

Serrano v. United States, 766 F. App'x at 565 (alteration added).  In Serrano v. United States, the Tenth Circuit stated that the district court addressed only the constitutional violation prong after concluding that Serrano had not established a constitutional violation and approved the district court's analysis, because the district court "also had to consider the reasonableness of the team's use of force for purposes of Serrano's [Federal Tort Claim Act, 28 U.S.C. §§ 1291, 1346, 1402, 2401-02, 2411-12, 2671-60,] claims."  Serrano v. United States, 766 F. App'x at 565.

The Court believes, as a general rule, that the constitutional violation analysis should receive more attention.  On remand from Kerns v. Bader, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by [the Tenth Circuit's] statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment."  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." Wood v. Strickland, 420 U.S. 308, 322 (1975). In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into

should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S.

---

behaving . . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, 3 F. Supp. 3d 1088, 1130-31 n.24 (D.N.M. 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).  Since Kerns v. Board of Commissioners, the Court has also observed:

> The unfortunate result of Kerns v. Bader is that nuanced factual distinctions can create a near-insurmountable hurdle for plaintiffs attempting to overcome a qualified immunity defense without a precisely analogous precedent.

> A secondary consequence of Kerns v. Bader is that constitutional protections are unlikely to develop in the Tenth Circuit beyond where they stood at the time the case was decided.

A.M. ex rel. Youngers v. N.M. Dep't of Health, 108 F. Supp. 3d 963, 1029 (D.N.M. 2015)(Browning, J.).

at 236-37).[14]  See Camreta v. Greene, 563 U.S. at 707.  The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182; Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

> ## 2.      Clearly Established Rights.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he or she did violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing

---

[14]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz works better.

violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 563 U.S. at 741.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 566 U.S. at 664 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741).  "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)(quoting Malley v. Briggs, 475 U.S. at 341).

    "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  The Supreme Court has stated: "[T]he clearly established right must be defined with specificity."  City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019).  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 563 U.S. at 742.  "[T]the clearly established law must[, rather,] be 'particularized' to the facts of the case," White v. Pauly, 137 S. Ct. 548, 552 (2017)(quoting Anderson v. Creighton, 483 U.S. at 640); under this view of the clearly established prong, a court should inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances, see City of Escondido v. Emmons, 139 S. Ct. at 503 (directing the Court of Appeals to ask, in excessive force cases, "whether clearly established law prohibited the officers from

stopping and taking down a man in these circumstances"). See Ziglar v. Abbasi, 137 S. Ct. 1843,

1866 (2017)("[T]he dispositive question is 'whether the violative nature of particular conduct is

clearly established.'" (quoting Mullenix v. Luna, 136 S. Ct. at 308)); Dist. of Columbia v. Wesby,

138 S. Ct. 577, 591 (2018)("Tellingly, neither the panel majority nor the partygoers have identified

a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth

Amendment violation under similar circumstances.").

      The Tenth Circuit has, however, emphasized the Supreme Court's statements that, in some

situations, "clearly established general rules of law can provide notice of the unlawfulness of an

official's conduct in appropriate circumstances." A.N. by & through Ponder v. Syling, 928 F.3d

1191, 1198 (10th Cir. 2019). The Tenth Circuit has commented: "'[G]eneral statements of the law

are not inherently incapable of giving fair and clear warning to officers' that their conduct violates

a constitutional right, and that such statements provide the required notice when 'the unlawfulness'

of their conduct is 'apparent' from the pre-existing law." A.N. by & through Ponder v. Syling,

928 F.3d at 1198 (quoting White v. Pauly, 137 S. Ct. at 552). According to the Tenth Circuit,

"'[g]eneral statements of the law can clearly establish a right for qualified immunity purposes if

they apply with obvious clarity to the specific conduct in question.' And this is so 'even though

the very action in question has not previously been held unlawful.'" A.N. by & through Ponder v.

Syling, 928 F.3d at 1198 (first quoting Halley v. Huckaby, 902 F.3d 1136, 1149 (10th Cir. 2018),

and then quoting Hope v. Pelzer, 536 U.S. 730 (2002)). The Tenth Circuit has cautioned that such

an approach is inappropriate where a case involves "relevant ambiguities." Colbruno v. Kessler,

928 F.3d 1155, 1165 (10th Cir. 2019)(citing Aldaba v. Pickens, 844 F.3d 870, 879 (10th Cir.

2016)("Aldaba II"); Thomson v. Salt Lake Cty., 584 F.3d at 1315-17).

      Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly

established inquiry, see Casey v. City of Fed. Heights, 509 F.3d at 1284 ("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit may have since walked back its holding that a sliding-scale is the appropriate analysis, see Aldaba v. Pickens, 844 F.3d at 876.  In Aldaba II, the Tenth Circuit reconsidered its ruling from Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba I"), that officers were entitled to qualified immunity after the Supreme Court vacated its decision in light of Mullenix v. Luna.  In concluding that it had previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . . by relying on excessive-force cases markedly different from this one. Although we cited Graham v. Connor, 490 U.S. 386 (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it.  Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity.  We also relied on several cases resolving excessive-force claims.  But none of those cases remotely involved a situation as here.

Aldaba II, 844 F.3d at 876.  The Tenth Circuit further noted that its sliding-scale approach may have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S. at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that case.  See Aldaba II, 844 F.3d at 874 n.1.  See also Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10 (10th Cir. 2017).  The Tenth Circuit explained:

> To show clearly established law, the Hope Court did not require earlier cases with "fundamentally similar" facts, noting that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741 . . . .  This calls to mind our sliding-scale approach measuring the egregiousness of conduct.  See Morris v. Noe, 672 F.3d 1185, 1196 (10th Cir. 2012).  But the Supreme Court has vacated our opinion here and remanded for us to reconsider our opinion in view of Mullenix, which reversed the [United States Court of Appeals for the] Fifth Circuit after finding that the cases it relied on were "simply too factually distinct to speak clearly to the specific circumstances here." 136 S. Ct. at 312.  We also note that the majority opinion in Mullenix does not cite Hope v. Pelzer . . . .  As can happen over time, the Supreme Court might be emphasizing different portions of its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1.  Since Aldaba II, the Supreme Court has reversed, per curiam,

another Tenth Circuit qualified immunity decision.  See White v. Pauly, 137 S. Ct. at 551.  In

White v. Pauly, the Supreme Court explained: "The panel majority misunderstood the 'clearly

established' analysis: It failed to identify a case where an officer acting under similar

circumstances as Officer White was held to have violated the Fourth Amendment."  White v.

Pauly, 137 S. Ct. at 552.[15]  The Supreme Court's per curiam reversals appear to have the Tenth

---

[15]The Supreme Court has signaled to the lower courts that a factually identical or a highly similar factual case is required for the law to be clearly established.  Factually identical or highly similar factual cases are not, however, the way the real world works.  Cases differ.  Many cases have so many facts that are unlikely to ever occur again in a significantly similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern.").  The Supreme Court's view of the clearly established prong assumes that officers are well-versed in Supreme Court and Tenth Circuit opinions.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?"  Thus, when the Supreme Court grounds its clearly established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. at 1153, yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).  The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong. See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with the Supreme Court's approach.  The most restrained, principled approach is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy.  As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based."  Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, White v. Pauly, 137 S. Ct. 548 (2017)(No. 17-1078)("Cato Brief").  "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials."  Cato Brief at 2.  "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct.  Judges and

Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g., Choate v. Huff, 773 F. App'x 484, 487-88 (10th Cir. 2019)(unpublished); Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Rife v. Jefferson, 742 F. App'x 377, 381-88 (10th Cir. 2018)(unpublished); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552, 555-56 (10th Cir. 2017)(unpublished); Brown v. City of Colo. Springs, 709 F. App'x 906, 915 (10th Cir. 2017(unpublished); Aldaba II, 844 F.3d at 874, and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see A.N. by & through Ponder v. Syling, 928 F.3d at 1198 (concluding that the publication of information about

---

scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification."  Cato Brief at 2.  See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect).  Further, as the Honorable Clarence Thomas, Associate Justice for the Supreme Court, has argued, because the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in 'interpret[ing] the intent of Congress in enacting' the Act."  Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Malley v. Briggs, 475 U.S. at 342).  "Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make."  Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Rehberg v. Paulk, 566 U.S. 356, 363 (2012)).  The judiciary should be true to § 1983 as Congress wrote it.

Moreover, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive.  If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision.  Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law.  See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015).  And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, 69 Stan. L. Rev. Online 163 (2017) -- seems to agree with the Court, see, e.g., Casey v. City of Fed. Heights, 509 F.3d at 1286, the per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see Aldaba II, 844 F.3d at 874; Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x at 555-56; Brown v. City of Colo. Springs, 709 F. App'x 906, 915-16 (10th Cir. 2017), and willing to reverse district court decisions.

an arrested and detained juvenile violated clearly established equal protection law prohibiting treating the juvenile differently than similarly situated juveniles); Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

## ANALYSIS

The Court concludes that Gotovac and Bolen have not alleged facts sufficient to state a Fourteenth Amendment due process claim.  The Court will dismiss Gotovac and Bolen's due process claim, as Trejo did not deprive them of any protected property or liberty interest.  Trejo's actions also did not violate Gotovac and Bolen's rights under the Equal Protection Clause.  Further, Trejo is entitled to qualified immunity, because he did not violate any clearly established constitutional right.  Accordingly, the Court will dismiss the Complaint under rule 12(b)(6).

## I.     GOTOVAC AND BOLEN HAVE NOT ALLEGED FACTS SUFFICIENT TO STATE A FOURTEENTH AMENDMENT DUE PROCESS OR EQUAL PROTECTION CLAIM.

Gotovac and Bolen have not alleged facts sufficient to state a Fourteenth Amendment due process or equal protection claim.  As for their procedural due process claim, Gotovac and Bolen have no protected property interest in racing in a specific race for which they assert they should have qualified.  Their substantive due process claim also fails, as they have not proven that Trejo's actions shock the judicial conscience. They also have not alleged an Equal Protection Clause claim, because they have not alleged that they were treated differently than similarly situated persons.

A.    GOTOVAC AND BOLEN DO NOT HAVE A PROPERTY INTEREST IN RACING IN A SPECIFIC RACE.

Gotovac and Bolen contend that they have a constitutionally protected right to engage in horse racing.  The Due Process Clause of the Fourteenth Amendment states: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.  The Supreme Court, in Board of Regents of State Colleges v. Roth, decided that, to assert a property right for a certain benefit, there must be a legitimate claim to it, rather than a "unilateral expectation."   The right to a horse racing license is generally acknowledged to be an interest that the Due Process Clause protects, see Barry v. Barchi, 443 U.S. at 64, as is the right to participate in the horse racing business, see Castanon v. Cathey, No. 19-6141, 2020 WL 4723732 (10th Cir. Aug. 14, 2020), but there is no protected right to qualify for or participate in a specific race, see Simon v. Taylor, 981 F. Supp. 2d at 1036.

In Castanon v. Cathey, released August 14, 2020, the Tenth Circuit concluded that there is no property or liberty interest in enforcing horse-racing regulations and statutes that provide extensive discretion to state officials in permitting particular horses in particular races.  See 2020 WL 4723732, at *2-*4.  The plaintiffs in Castanon v. Cathey owned two horses who had the same trainer.  See 2020 WL 4723732, at *1.  One of the plaintiffs' horses tested positive for a banned substance after winning a race, and the Oklahoma Horse Racing Commission suspended the trainer's license.  See 2020 WL 4723732, at *1.  After the Oklahoma Horse Racing Commission's executive director declined to stay the disqualification order, the plaintiffs' second horse was not allowed to participate in a race.  See 2020 WL 4723732, at *1.   The plaintiffs challenged the executive director's decision for preventing  "their opportunity to participate in a single race while the trainer was under suspension," but the Tenth Circuit concluded that "the inability to participate

in one horse race did not implicate the owner's due process liberty interest in pursuing his business of racing horses."  Castanon v. Cathey, 2020 WL 4723732, at *4.

Further, the Court has already decided a factually similar case.  Simon v. Taylor, 981 F. Supp. 2d at 1036, concerned two racehorse owners that filed suit against the NMRC after their horse lost a close race to another horse that was later removed for a banned substance.  The plaintiffs alleged that the NMRC's decision to exclude the second-place finisher from the first place finisher's administrative challenge to his horse's initial disqualification after testing positive for a banned substance violated due process.  981 F. Supp. 2d at 1036.  The Court concluded: "The due-process clause is not so broad as to create a property right for second-place finishers or to give them a special 'constitutional' hearing that state law does not give them."  See 981 F. Supp. 2d at 1068.  The Court further stated:

> For the Plaintiffs' position to prevail, the law would have to secure for athletic event losers a property right to step (or gallop) into the shoes of an allegedly ineligible winner and claim the spoils of another's victory as their "property" -- and that the Constitution guarantees the second-place finisher a taxpayer-funded hearing before a state actor may deprive them of that "property."  The Constitution does not require the state to provide any regulations of or hearings for athletic events.

See 981 F. Supp. 2d at 1067-68.  Simon v. Taylor presented a stronger case than the present issue for a due process right in the outcome of a horse race, but the Court held that owners did not have a protected property interest in the benefits of victory sufficient to bring a procedural due process challenge.  While it is true that Gotovac and Bolen have a right to engage in horse racing as a profession, and that having their license stripped without due process could violate the Fourteenth Amendment, see Barry v. Barchi, 443 U.S. at 61, as Trejo concedes in his Reply, they do not have a right to race in a specific race, and the expectation that they would have placed in a certain position does not bestow that right on them, see Bd. of Regents of State Colleges v. Roth, 408 U.S. at 577.

There is no protected property interest in placing in a specific qualifying race.  The Due Process Clause does not protect second-place finishers or, in this case, seventh-place finishers, in having a property right related to the outcome of a particular race.  See Simon v. Taylor 981 F. Supp. 2d at 1067-68.  The property right lies in the licensing and the right to engage in horse racing, generally, as a profession, and not to engage in a specific race which Gotovac and Bolen argue they, in fairness, deserved.  See Simon v. Taylor, 981 F. Supp. 2d at 1065.  In order to allege a valid procedural due process claim, Gotovac and Bolen must have a property interest in a top five placement and the benefits that entails.  The Court has found there is no protected property right in the outcome of any particular race, however, and therefore the Court will dismiss their due process claim.

Further, qualified immunity protects Trejo from liability for Gotovac and Bolen's due process claim.  Qualified immunity shields public officials sued in their individual capacities, as "public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability."  Harlow v. Fitzgerald, 457 U.S. at 806.  For a plaintiff to overcome a qualified immunity defense, he or she must "plead facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  Harlow v. Fitzgerald, 457 U.S. at 818.  The Court has already analyzed whether Trejo violated Gotovac and Bolen's constitutional right; it now evaluates whether the rights that Gotovac and Bolen allege Trejo violated are clearly established.

While Trejo's decision to allow the transfer of horses was unpopular, it did not violate any clearly established right.[16]   Gotovac and Bolen can assert that a clearly established right was violated through citing an on-point Supreme Court or Tenth Circuit decision; alternatively, "the clearly established weight of authority from other courts must have found the law to be as" the plaintiffs maintain.  Grissom v. Roberts, 902 F.3d 1162, 1168 (10th Cir. 2018)(internal quotation marks and citation omitted); Castanon v. Cathey, 402 F. Supp. 3d at 1250.  An on-point decision means that "the precedent must be particularized to the facts." Apodaca v. Raemisch, 864 F.3d 1071, 1076 (10th Cir. 2017).

Gotovac and Bolen cite several cases that involve horse racing.  See Response at 6-7, citing Barry v. Barchi, 443 U.S. at 61, Stinebaugh v. N.M. Racing Comm'n No. 32,840, 2015 WL 4874288 (N.M. Ct. App. July 9, 2015).  These cases relate to the issue of the right to have a horse racing license, but not the right to a specific outcome of a certain race, or the right to compete only against horses whose trainers have not been suspended.  See Response at 6-7; Barry v. Barchi, 443 U.S. at 61, Simon v. Taylor, 981 F. Supp. 2d at 1036.  In this case, Gotovac and Bolen were using their horse to compete for a qualifying spot in another race, and the Court has already found that there is no constitutionally protected property interest in using a horse to qualify in another race, as they do not demonstrate that they had a property interest in a top-five placement.  The right, therefore, was not clearly established, as there is no on-point decision that established precedent with materially similar facts to the case at hand.  The right to a license and the right to qualifying

---

[16]      A right is considered clearly established when a reasonable official would have understood that what he or she was doing violated that right. See Estate of Reat v. Rodriguez, 824 F.3d 960, 964-65 (10th Cir. 2016); Castanon v. Cathey, 402 F. Supp. 3d 1240 (W.D. Okla. 2019)(Russell, J.), aff'd, No. 19-6141, 2020 WL 4723732 (10th Cir. Aug. 14, 2020)

for a specific race are two fundamentally different issues.  Therefore, qualified immunity bars Gotovac and Bolen's claims.

B.   **GOTOVAC AND BOLEN HAVE NOT ALLEGED CONDUCT THAT SHOCKS THE JUDICIAL CONSCIENCE**

Gotovac and Bolen assert that Trejo's actions in allowing the transfer also violated their substantive due process rights.  "A substantive due process claim can take one of two forms. One form may involve the violation of an individual's fundamental liberty interests, and the other form may arise from governmental conduct that shocks the conscience."  Seegmiller v. LaVerkin City, 528 F.3d at 767 (citing Chavez v. Martinez, 538 U.S. at 787; Milner v. Mares, No. 2017 WL 5151311, at *5).  For the first strand of substantive due process, only fundamental rights and liberties which are "'deeply rooted in this Nation's history and tradition'" and "'implicit in the concept of ordered liberty'" qualify for such protection.  Seegmiller v. LaVerkin City, 528 F.3d at 767 (quoting Chavez v. Martinez, 538 U.S. at 787).  A right that is "deeply rooted" and "implicit in the concept of ordered liberty" requires objective, substantive standards mandating particular outcomes, Castanon v. Cathey, 402 F. Supp. 3d at 1253, which is a requirement that the allegations in the Complaint do not meet.  Gotovac and Bolen submitted in the December 3, 2019 hearing that their procedural Due Process claim was stronger than their substantive Due Process claim, see Tr. at 37:24-25 (Dunn), and, indeed, Gotovac and Bolen have not pled facts sufficient to assert that their alleged interests here warrant substantive due process protection under this strand, because the facts do not implicate any values or concerns that are implicit in the concept of ordered liberty.

As for the second strand of substantive due process, "only the most egregious official conduct" is prohibited."  Milner v. Mares, 2017 WL 5151311, at *5.  "Even most intentionally inflicted injuries caused by misuse of government authority will not meet this standard."  Milner v. Mares, 2017 WL 5151311, at *5.  Gotovac and Bolen do not allege any behavior by Trejo that

is egregious enough to "shock the conscience."  They assert that Trejo allowed the transfer of Woods' horses in violation of the NMAC, and the transferred horses placed in the top five of a qualifying event for the All American Futurity race, knocking their horse out of the top five and thus that their horse didn't qualify for the All American Futurity race. See Complaint ¶ 15 at 3. This allegation, by itself, does not shock the conscience of the judiciary.

Further, Gotovac and Bolen's allegations in this matter closely mirror that in Milner v. Mares, where a horse was scratched from a race because the plaintiffs did not have original breed certificates on file.  See Milner v. Mares, 754 F. App'x at 777.  They alleged that there were other trainers whose horses were not scratched, though they also did not have their breed certifications on file.  See Milner v. Mares, 754 F. App'x at 777-78.  Defendants argued that this action was taken because of a specific interpretation on the NMAC on that day, but the district court held that no substantive due process right in this case was violated, as it was  "not clearly established . . . that the horse owners had a property interest in their interpretation of the Rule or to expect that the Rule would not be enforced as it was."  Milner v. Mares, 2017 WL 5151311, at *4.  As with the procedural due process claim, Gotovac and Bolen have not identified any on point cases that relate to the substantive due process claim.  They also have not alleged any behavior that could shock the conscience of the judiciary.  As Gotovac and Bolen have not identified any relevant cases, nor pointed to actions taken by Trejo that would shock the conscience, qualified immunity bars their procedural due claims, because existing precedent has not "placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 566 U.S. at 664.

### C.    GOTOVAC AND BOLEN DO NOT STATE AN EQUAL PROTECTION CLAIM.

Gotovac and Bolen allege that Trejo's actions deprived them of equal protection under the law.  Trejo argues that this claim is unsustainable, because the "Plaintiffs did not claim that they

were treated differently than anyone else and therefore cannot sustain a viable equal protection claim."  Reply at 7.  Though Gotovac and Bolen do not allege that they are part of a protected group or class, see Tr. at 39:16 (Dunn), they still can bring claims under the class-of-one theory, see SECSYS, LLC v. Vigil, 666 F.3d 678, 689 (10th Cir. 2012)(concluding that, to prevail on a "class- of-one" claim, a "plaintiff must show he or she (as opposed to a class in which he is a member) was 'intentionally treated differently from others similarly situated'" (quoting Vill. of Willowbrook v. Olech, 528 U.S. at 564)).   To sustain a successful class-of-one challenge, the plaintiff must show that there is no rational basis for the different treatment.  See SECSYS, LLC v. Vigil, 666 F.3d at 688.   In the years after the Supreme Court's decision in Village of Willowbrook v. Olech, the Tenth Circuit expressed concerns about entertaining some class-of-one challenges:

> [T]he concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors.  It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review.  This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decision-making: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.

Jennings v. City of Stillwater, 383 F.3d at 1210-11.  See Enquist v. Or. Dep't of Agric., 553 U.S. 591, 604 (2008)("[A]llowing an equal protection claim on the ground that a ticket was given to one person and no others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action."); McGuire v. Nielsen, 2020 WL 1332582, at *29.  Gotovac and Bolen fail to state how they were treated differently than similarly situated trainers, because the alleged unlawful transfer of these horses affected everyone in the racing

community in the same way, and as every other trainer also competing for a top-five spot had to compete against the same horses that Gotovac and Bolen allege should not have raced. It affected the entire community to the extent that Trejo felt compelled to send an explanation of his actions in a letter titled "To the Racing Community." Trejo Letter at 1. Similarly, they have not identified any owners that were not allowed to transfer their horses under the same circumstances -- including the two-day administrative delay -- nor did they claim that their horses had a similar banned substance but were barred from transferring. Essentially, their claim rests on the theory that Trejo's decision to allow Woods to transfer his horses constitutes an equal protection violation, as this was an exception to typical NMRC rules and regulations. This theory does not state an equal protection claim, as Gotovac and Bolen were not treated differently than other similarly situated trainers, and only Woods is treated differently. Gotovac and Bolen characterized there alleged equal protection claim based on someone else being treated differently as an "inverse" equal protection claim. Tr. at 40:24-25 (Dunn). However, Gotovac and Bolen have cited no case which supports such an "inverse" equal protection claim or theory, and the Court has found none on its own. The fact that Gotovac and Bolen do not identify other trainers in the same situation that were barred from transferring and that they fail to show how this move impacted them above any other trainers renders the equal protection claim inadequate.

Gotovac and Bolen do not show that they were treated differently from others similarly situated. They have cited no case that establishes precedent with materially similar facts to uphold their "inverse" equal protection claim. See Tr. at 49:17-25 (Dunn). Due to these factors, the Court finds that there is no constitutional right that Trejo has violated, and there is no clearly established right that Trejo has violated. Qualified immunity thus bars Gotovac and Bolen's claims.

**IT IS ORDERED** that the Defendant's Motion to Dismiss, filed October 25, 2019 (Doc. 12), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

A. Blair Dunn
Western Agriculture, Resource and Business Advocates, LLP
Albuquerque, New Mexico

     *Attorneys for the Plaintiffs*

Paula Grace Maynes
Michael Bebeau
Miller Stratvert, P.A.
Albuquerque, New Mexico

     *Attorney for the Defendants*